**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

NICHOLAS KAFANTARIS,              )        CASE NO. 1:17CV568
                                  )
            Plaintiff,            )        JUDGE SARA LIOI
                                  )
        v.                        )        MAGISTRATE JUDGE
                                  )        JONATHAN D. GREENBERG
NANCY A. BERRYHILL,               )
        Acting Commissioner       )
        of Social Security,       )
                                  )        **REPORT AND**
            Defendant.            )        **RECOMMENDATION**

Plaintiff, Nicholas Kafantaris, ("Plaintiff" or "Kafantaris"), challenges the final decision

of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In January 2014, Kafantaris filed applications for POD and DIB,[2] alleging a disability

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] The record reflects Kafantaris also filed an application for Social Security Income
("SSI") on January 15, 2014.  (Tr. 239.)  That application was approved and Kafantaris

onset date of September 5, 2005 and claiming he was disabled due to "electrocution in 2005, broken back 11/19/13 and 2005, back issues, bleeding around brain, blindness in one eye, foot injury– pins in ankle."  (Transcript ("Tr.") 20, 152, 185.)  The applications were denied initially and upon reconsideration, and Kafantaris requested a hearing before an administrative law judge ("ALJ").  (Tr. 20, 95-105, 107-113, 115.)

On December 17, 2015, an ALJ held a hearing, during which Kafantaris, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 33-64.)  On February 2, 2016, the ALJ issued a written decision finding Kafantaris was not disabled.  (Tr. 20-28.)  The ALJ' s decision became final on January 19, 2017, when the Appeals Council declined further review. (Tr. 1-7.)

On March 20, 2017, Kafantaris filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15.) Kafantaris asserts the following assignments of error:

> (1)  The ALJ's decision is contrary to law and/or not based upon substantial evidence because it failed to mention or apply SSR 83-20 to determine Plaintiff's onset date.
>
> (2)  The ALJ's RFC determination is contrary to law and/or not based upon substantial evidence.
>
> (3)  The ALJ's Step 5 determination is contrary to law and/or not based upon substantial evidence.

(Doc. No. 13.)

---

was found to be eligible for SSI based on being disabled as of April 26, 2014.  (Tr. 239-240.)

## II.   EVIDENCE

**A.      Personal and Vocational Evidence**

Kafantaris was born in December 1959 and was fifty-five (55) years-old at the time of his administrative hearing, making him a "person of advanced age" under social security regulations. (Tr. 27.)  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e).  He has a limited education and is able to communicate in English.  (*Id.*)  He has past relevant work as a blast furnace keeper helper and painter helper.  (Tr. 27.)

**B.      Relevant Medical Evidence[3]**

The record reflects that, at some point prior to his DLI, Kafantaris was badly injured while working as a bridge painter.  Specifically, Kafantaris' medical records indicate he was electrocuted, resulting in a fracture of his thoracic vertebra and second to third degree burns on his abdomen, palm, and fingers/thumb.  (Tr. 459-461, 312.)

The earliest medical record cited by the parties is dated December 6, 2004.  On that date, Kafantaris presented to clinical psychologist Anita Gantner, Ph.D., for a follow-up visit.  (Tr. 311–313.)  At this time, his mood "remain[ed] depressed."  (Tr. 311.)  Kafantaris was "continuing to scour the newspaper looking for jobs but [felt] disheartened."  (*Id.*)  Dr. Gantner suggested he consider securing a GED to enhance the possibility of obtaining a job.  (*Id.*)  She concluded "currently the patient's mood is interfering with his ability to secure employment," noting, if he was successful, "I believe his mood disorder would diminish."  (*Id.*)  Accordingly, "encouraging employment is part of our therapeutic goal."  (*Id.*)  She diagnosed major

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

depression, single episode, moderate.  (Tr. 312.)

Dr. Gantner's treatment note lists Kafantaris' "problem list" as including closed fracture of thoracic vertebra, second degree burn of palm, second degree burn of abdominal wall, and third degree burn of finger with thumb.  (Tr. 312.)  The treatment note indicates these conditions were first noted in September and/or October 2003.[4]  (*Id*.)  Kafantaris' problem list also included major depression, single episode, moderate; and Post-Traumatic Stress Disorder ("PTSD"), both of which were first noted in May 2004.  (*Id*.)  Kafantaris' medications are listed as Zoloft, Topamax, Elavil, Vicodin, Flexeril, Naprosyn, Neurontin, Ultracet Tabs, and Percocet.  (Tr. 311-312.)

Kafantaris returned to Dr. Gantner one week later, on December 13, 2004.  (Tr. 314-316.)  His mood remained unchanged.  (Tr. 314.)  Dr. Gantner provided Kafantaris with information regarding GED preparation and "strongly suggested that he continue on this path and use his time productively."  (*Id*.)  She also noted "interpersonal strife" in Kafantaris' home life had "subsided somewhat."  (*Id*.)

On January 28, 2005, Dr. Gantner noted Kafantaris' mood and energy level had improved.  (Tr. 317.)  She noted he learned of a potential job at the end of April "which he intends to pursue," as well as a community GED class.  (*Id*.)  On March 4, 2005, Kafantaris was "in good spirits."  (Tr. 374.)  Dr. Gantner noted "his granddaughter was born two weeks ago and the event has been the source of considerable joy for the family."  (*Id*.)  Kafantaris reported improved sleep and "significantly reduced" drinking, but indicated he had been having

---

[4] Dr. Gantner's treatment note also lists lumbar sprain as one of Kafantaris' conditions, stating it was first noted on September 7, 2003 and resolved on April 5, 2004.  (Tr. 312.)

4

"disturbing dreams regarding his accident." (*Id.*)  He registered to begin GED classes and "still thinks he will have a job at the end of April." (*Id.*)  Dr. Gantner continued to diagnose major depression, single episode, moderate.  (Tr. 321-322.)

Kafantaris returned to Dr. Gantner on April 1, 2005.  (Tr. 373.)  His mood was depressed, and his affect was irritable.  (*Id.*)  Kafantaris reported he had taken the initial course offerings for the GED and preliminary tests but scored poorly.  (*Id.*)  He "decided that he did not have the energy or confidence to invest himself in the process," but still hoped to be working by the end of the month.  (*Id.*)  Dr. Gantner felt he might benefit from an increase in his Zoloft dosage.  (*Id.*)

On April 29, 2005, Dr. Gantner noted Kafantaris' mood remained unchanged, and his family was reporting increased irritability.  (Tr. 370.)  She "reiterated [her] belief that it will be therapeutic for him to be working again, in a structured environment, and earning a reasonable wage." (*Id.*)  Shortly thereafter, on May 3, 2005, Dr. Gantner wrote the following letter:

> To Whom It May Concern:
>
> I have been seeing Mr. Kafantaris for treatment of depression.  I do not believe that he has reached [maximum medical improvement] status at this time.  I have just submitted a C-9 for a psychiatric evaluation and medication management.  He has been taking an anti-depressant prescribed by his medical physician of record.  The medication does not appear to be helping to relieve the symptoms of depression, and at this point, I believe an evaluation by a psychiatrist is in order.
>
> Despite his ongoing depression, I do believe that Mr. Kafantaris is ready to return to work.  In fact, I believe that return to work would indeed be therapeutic.  Consequently, I have explained to Mr. Kafantaris that I will not be renewing his C-84 at this time.  He has made arrangements to begin working this month.  I will follow him closely as he makes this transition to return to  work, and make recommendations as appropriate.

(Tr. 371.)

On November 14, 2005, Kafantaris underwent a comprehensive neuropsychological

5

evaluation by Jerry Flexman, Ph.D., "secondary to electrocution injury."  (Tr. 368, 460.)  Dr. Flexman noted Kafantaris reported "some confusion," short term memory problems, and decreased attention.  (Tr. 368.)  Dr. Flexman diagnosed "rule out cognitive disorder."  (*Id*.) In addition, Kafantaris' primary care doctor, Michael Harris, M.D., indicated the evaluation "confirmed depression and PTSD, and noted marked difficulty with conceptualization, poor memory for designs, and slight inattentiveness on sustained performance testing."  (Tr. 460.)

Kafantaris returned to Dr. Gantner several months later, on November 21, 2005.  (Tr. 365.)  Kafantaris reported he had been working as a painter and "the season ended this month."  (*Id.*)  Although "he saw the season through, he did so at a physical cost."  (*Id*.)  Kafantaris reported he "regularly missed a day or two a week due to pain and fatigue."  (*Id*.)  He also reported "increased numbness in his extremities."  (*Id.*)  Kafantaris described irritability, feelings of hopelessness, decreased concentration and failures of long-term memory, poor sleep, flashbacks, and "nightmares regarding the accident . . . 3-4x weekly."  (*Id*.)  He stated he "avoids things having to do with electricity such as plugging appliances into electrical outlets" and walking under power lines.  (*Id*.)  Kafantaris also stated his "alcohol abuse has continued although at slightly reduced frequency."  (*Id*.)  He admitted drinking frequently two to three times per week ("frequently to excess") and stated he received a DUI three weeks previously while driving under a suspended license.  (*Id.*)  Nonetheless, Kafantaris stated he regularly babysat for his granddaughter and "finds he does not lose his temper around her."  (*Id*.)  Dr. Gantner continued to diagnose major depression, single episode, moderate.  (Tr. 468.)

On December 13, 2005, Kafantaris had improved mood, but persistent PTSD symptoms including flashbacks and nightmares.  (Tr. 363.)  Dr. Gantner recommended therapy to directly

address his PTSD symptoms and indicated Kafantaris "was open to doing so."  (*Id*.)  Kafantaris

also reported as follows:

> The patient has been researching electrical injuries and has become increasingly
> concerned about the long-term effects of his injury.  He worries also that he will
> not be able to work again because no one will hire him.  He had been working for
> a family member this summer and they are likely getting out of the business.  They
> tolerated his erratic performance which he imagines no one else will.

(*Id*.)  Dr. Gantner diagnosed Kafantaris with PTSD.  (Tr. 465.)

On December 15, 2005, Kafantaris presented to Dr. Harris.  (Tr. 459-460.)  Dr. Harris

noted as follows:

> The patient presents today for followup.  I have not seen him since September
> 2004.  He thought that since I released him to go back to work that he was done.
> Unfortunately, he is still having problems. He did manage to go back to work at
> full capacity, in September 04, and managed to work until about November 05, but
> he was clearly struggling.  He got laid off due to the seasonal aspect of his job.  He
> has had some trouble finding a  job based on his injury.
>
> Present complaints include persistent thoracic and lumbar pain with right leg pain
> worse with prolonged standing.  He also complains of increased shoulder pain over
> the last several months which he attributes to the painting.  In addition, he has had
> significant memory deficits.  He has had to use a notebook and he sees Dr. Gantner
> for major depression, which is an allowed part.  He also suffers from PTSD.
>
> * * *
>
> Work-up has included x-rays and MRIs of thoracic spine.  MRI of T-spine on
> 11/24/03 revealed the T3 compression fracture with mild edema.  X-rays of the
> lumbar spine revealed a grade 1 spinal listhesis at L5 on S1 with some degenerative
> changes.  CT of spine back on 9/10/03 again revealed the compression fracture at
> T6 with approximately 20% loss of vertebral body height.
>
> Presently he continues to complain of mid and low back pain which he rates at a
> 5-7/10 depending on his activity level.  He is worse with the cold weather.  He gets
> some tingling in his right leg intermittently.  He is on no medications.  He is not
> working and has not worked since November 2005.

(*Id.*)  On examination of Kafantaris' lower back, Dr. Harris noted some tenderness over the

7

lumbosacral junction and limited flexion to about 45 degrees with pain beyond that point. (Tr. 460.) There was no spasm or trigger, and straight leg raise was negative. (*Id*.) Neurological examination revealed 5/5 motor strength, normal sensation, and normal reflexes. (*Id*.) Dr. Harris noted, however, "there certainly seems to be some memory issues at play," stating Kafantaris had "poor recall and can remember only 2 out of 3 objects after 5 minutes." (*Id*.)

In conclusion, Dr. Harris stated "this is a 45 year old gentlemen status post work injury on September 7, 2003 resulting in T6 compression fracture, electrocution and burns, major depression and associated memory deficits and cognitive dysfunction." (*Id*.) He recommended a trial of Voltaren and speech therapy to "help with cognitive issues and memory." (Tr. 461.) Dr. Harris also determined Kafantaris "can work at a light to medium work capacity, up to 25# lift, but should avoid heights." (*Id*.)

Kafantaris returned to Dr. Gantner on December 30, 2005. (Tr. 362.) At that time his mood was unchanged. (*Id*.) He reported feeling worried about his ability to secure employment and "look[ed] forward to vocational rehabilitation." (*Id*.) Kafantaris also reported occasional drinking and stated he would begin attending AA meetings. (*Id*.)

The record reflects Kafantaris returned to Dr. Gantner on twelve occasions in 2006. On January 24, 2006, Kafantaris reported continuing legal troubles and consumption of alcohol. (Tr. 357.) He stated his "nightmares and night sweats have resumed since he recently moved back to his mother's home." (*Id*.) The following month, Kafantaris reported continuing nightmares and flashbacks. (Tr. 355.) Dr. Gantner indicated "when there is no longer a threat of incarceration, the patient will be scheduled for weekly exposure psychotherapy to address PTSD symptoms." (*Id*.)

8

On March 15, 2006, Kafantaris's mood was irritable.  (Tr. 353.)  He reported the following symptoms:

> Sleep problems have been pronounced recently.  He has been aware of nightmares which have been occurring approximately 3 of 7 nights.  He wakes in a sweat after these events.  He thinks of his accident 'all the time.'  Hypervigilance remains prominent.  The patient characterized his disposition as 'paranoid' saying that when walking down the street, he is always looking for someone to hurt/attack him.

(*Id*.)  Dr. Gantner began exposure therapy in April 2006.  (Tr. 351.)

Treatment records reflect Kafantaris initially resisted exposure therapy.  On April 19, 2006, he reported he had not been listening to his "exposure tape," the first step in his exposure therapy course of treatment.  (Tr. 347.)  On that date, Kafantaris complained of poor sleep and excessive drinking.  (*Id*.)  The following week, he was listening to his exposure tape but "not as frequently as instructed."  (Tr. 345.)  He reported drinking two of seven days per week, and stated his frustration tolerance was "exceedingly low."  (*Id*.)

By May 4, 2006, Kafantaris was listening to his exposure tape as instructed.  (Tr. 343.)  The following week he reported feeling "much less unnerved by listening to the tape," and indicated he "successfully completed one of the points [in the process] but had difficulty walking around power lines."  (Tr. 341.)  However, by the end of the session with Dr. Gantner, he was able to reduce his anxiety by more than one half.  (*Id*.)  By May 30, 2006, Kafantaris "stopped listening to his exposure tape as it no longer serves to elicit the anxiety it once did."  (Tr. 337.)  He shared "that he feels that he has been getting his anxiety under control," indicating "'It was just an accident.'"  (*Id*.)  On June 15, 2006, Kafantaris successfully completed his last assignment which involved walking on a large bridge.  (Tr. 338.)  He reported feeling much less anxious. (*Id*.)

9

On July 3, 2006, Kafantaris reported as follows:

> The patient reported that dreams about the accident have diminished to approximately 1x every 3 months.  He continues to have 'bad dreams' approximately nightly, but he does not believe the content is relevant to his accident.  He does not wake in a sweat.  Flashbacks are estimated to occur 4-5x monthly.  He has not been avoidant, but he does find himself cautious around reminders of the accident to include bridges, tension wires and electrical cords.  He remains hypervigilant, but feels his startle response has diminished.  He acknowledged being short-tempered and not as well equipped to handle stressful situations since his accident.

> Drinking remains a problem and has been since his accident.  He has been making efforts recently to curtail his drinking as he wants to spend more time caring for his granddaughter and reliably does not drink when he is around her.

(Tr. 339.)  Dr. Gantner determined Kafantaris had "successfully progressed through the hierarchy and completed a course of exposure therapy," resulting in "some relief of symptoms."  (*Id.*)  She "anticipated that he will continue to struggle with increased irritability and reduced frustration tolerance."  (*Id.*)

There is then a gap of nearly two and a half years in Kafantaris' treatment record.  The next medical record cited by the parties is an emergency room ("ER") report dated November 29, 2008.  (Tr. 265-269.)  On that date, Kafantaris was "pulled out of a car and beat up by another driver."  (Tr. 266.)  He was treated for a laceration on his forehead, and a hematoma and nondisplaced linear fracture of the base of the right nasal bone.  (Tr. 265-269.)  A CT of Kafantaris' cervical spine taken that date showed mild degenerative disc disease at C5-C6 and C6-C7.  (Tr. 285.)  A CT of his facial bones showed a fracture of the base of his right nasal bone, and a CT of his brain and head was normal.  (Tr. 287, 289.)

The remainder of Kafantaris' medical records post-date his March 31, 2010 DLI.  On December 15, 2010, Kafantaris presented to the ER after falling down the stairs while

10

intoxicated.  (Tr. 270-272, 277, 280.)  Imaging revealed a trimalleolar fracture of the left ankle,

and Kafantaris was admitted for treatment.  (Tr. 277, 280, 291.)  The following day, Kafantaris

underwent an open reduction and internal fixation.  (Tr. 277, 280-281.)  A subsequent x-ray

revealed Kafantaris' fracture was healing well.  (Tr. 277.)  Thereafter, on March 3, 2011,

Kafantaris underwent surgery to remove the hardware placed in his left ankle.  (Tr. 277-278, 282-

283.)

On October 4, 2013 (over three years after his DLI), Kafantaris presented to

opthalmologist Anthony Cirino, M.D.  (Tr. 378-379.)  Kafantaris complained of twitching in his

right eyelid, and blurry vision.  (*Id.*)  Vision testing without correction was 20/30 in both eyes.

(*Id.*)  Dr. Cirino's treatment note indicates diagnoses of blepharospasm, suspected glaucoma,

nuclear sclerosis cataract, and posterior subcapsular polar senile cataract.  (*Id.*)  Dr. Cirino did

not think surgery was "advisable at this time."  (*Id.*)  He prescribed glasses and advised

Kafantaris to return in six months.  (*Id.*)

On November 19, 2013, Kafantaris presented to the ER after falling off a ladder while

cleaning leaves from the gutter of his house.  (Tr. 417-419.)  A CT scan of his cervical spine

showed no evidence of acute fracture, but did reveal "a large anterior epidural hematoma with

significant compromise of the central canal and cervical cord."  (Tr. 261.)  In addition, a CT scan

of Kafantaris' lumbar spine showed an "anterior wedge compression fracture at L1 with some

retropulsion of the posterior vertebral margin superiorly," as well as T12 spinous process fracture

and bilateral pars defects L5-S1.  (Tr. 262-263.)  He was diagnosed with (1) cervical spine

epidural hematoma; (2) T12 spinous fracture; and (3) L1 compression fracture.  (Tr. 264.)

Kafantaris was transferred to another facility for segmental repair of his spinal fractures.  (Tr.

11

417-418.)  He was discharged from the hospital on November 25, 2013 in stable condition.  (*Id.*)

On December 17, 2013, Kafantaris presented to orthopedist Timothy Moore, M.D., for follow up.  (Tr. 384-385.)  He reported "doing pretty well."  (*Id.*)  On examination, Dr. Moore found Kafantaris' incisions were appropriate and he was neurologically intact in his upper and lower extremities.  (*Id.*)  He advised Kafantaris to "slowly get back into his normal routine." (*Id.*)

On March 20, 2014, Dr. Moore remarked Kafantaris was "doing great" with "no issues from the cervical hematoma."  (Tr. 497.)  He also stated Kafantaris was "moving around pretty well for this time of year concerning his back."  (*Id.*)

## C.    State Agency Reports

### 1.    Mental Impairments

On April 12, 2014, Kafantaris underwent a consultative psychological examination with James F. Sunbury, Ph.D.  (Tr. 504-508.)  Kafantaris reported he was divorced with two children, and had been living with his sister for the past five years.  (Tr. 504.)  He dropped out of school in the 10th grade, and had not earned his GED.  (*Id.*)  He worked for 22 years at a steel mill before being laid off.  (Tr. 505.)  Kafantaris stated his most recent job was as a laborer for a bridge painting company.  (*Id.*)  He worked there for one year "until a crane crossed a power line and electrocuted him in 2005."  (*Id.*)  Kafantaris indicated he has not been employed since.  (*Id.*)  He applied for disability because he "just couldn't get around."  (*Id.*)

Kafantaris reported the following treatment history:

Mr. Nicholas Kafantaris has not been hospitalized for psychiatric care.  He had counseling in hospital for emotional trauma after being shocked in 2005.  He took antidepressants for a short time then, but he has had no treatment since.  He has a history of alcohol use disorder.  He did have alcohol related arrests.  He has been

12

'in and out' of AA.  He didn't skip work due to drinking.  He still drinks 'too
much' at times.  He denied drug abuse.

Regarding his physical health; he told me that he had surgery after his fall in
November.  He had a fractured vertebra.  No head injuries are noted in the medical
records from 2013.  He is not in physical therapy.  He doesn't see a chiropractor.
He has a twitch around his right eye.  He is taking no medications.

(Tr. 505.)

On examination, Dr. Sunbury noted Kafantaris "walked with the aid of a cane, with a bit

of a limp." (*Id*.)  He was neatly groomed and "there was no indication of exaggeration or

minimization of symptoms." (*Id*.)  Dr. Sunbury found Kafantaris was cooperative, alert and

oriented to place and person, and had good eye contact.  (Tr. 505-506.)  His speech was normal,

with no rambling or tangential responses.  (Tr. 506.)  During the examination, Kafantaris was not

tearful, irritable or acutely upset and, in fact, "smiled occasionally [and] chuckled at the mental

status questions." (*Id*.)  He reported "sometimes he gets the blues," but his appetite was "okay"

and he denied any "trouble with his temper." (*Id*.)  Kafantaris denied panic attacks and showed

no sign of thought disorder. (*Id*.)  He did report disturbed sleep due to worrying, and stated "he

has always had nightmares once or twice a month." (*Id*.)  Kafantaris was able to recall past and

present events without difficulty; could repeat seven digits forward and three backward; and

could recall one of three objects after five minutes. (*Id*.)  Dr. Sunbury estimated Kafantaris'

intellectual functioning was in the average range, and found his insight and judgment "seemed

low-average." (*Id*.)

Dr. Sunbury assessed alcohol use disorder, mild.  (Tr. 507.)  With regard to the four

mental functional categories, he opined as follows:

**Describe the claimant's abilities and limitations in understanding,
remembering, and carrying out instructions.**

13

If granted disability payments, Mr. Nicholas Kafantaris would be capable of managing the funds in his own best interest. His intellectual functioning seems average.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**
He concentrated well in the office today. He described persistence limited by his physical injuries. 'I just can't get around.' Sometimes he feels 'blue' but depression is not a limiting factor in the above functions.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to co-workers in a work setting.**
He related appropriately in the office. He denied temper problems on the job but he does have a history of social problems related to temper and alcohol. He was steadily employed before his injury in 2005.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**
The limitations are physical ones, per his description. His sleep is sometimes disturbed by worries, but more often by pain. He has had no treatment for depression or anxiety since 2005.

(Tr. 507-508.)

On April 24, 2014, state agency psychologist Aracelis Rivera, Psy.D., reviewed Kafantaris' medical records and completed a Psychiatric Review Technique ("PRT") for the time period between Kafantaris' alleged onset date of September 5, 2005 and his DLI of March 31, 2010. (Tr. 72.) Dr. Rivera concluded there was "insufficient evidence to fully assess [Kafantaris'] psychological functioning prior to" his DLI. (*Id.*)

Dr. Rivera also completed a PRT with respect to Kafantaris' current mental functioning. (Tr. 73.) She concluded Kafantaris had mild restrictions in the categories of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (*Id.*) He had no repeated episodes of decompensation, each of extended duration. (*Id.*) Dr. Rivera concluded "there is no evidence of a severe psychological [medically determinable impairment]

14

imposing more than minimal work-related functional limitations."  (*Id.*)

On June 24, 2014, state agency psychologist Leslie Rudy, Ph.D., reviewed Kafantaris'
medical records and determined there was insufficient evidence to complete a PRT for the time
period between Kafantaris' alleged onset date of September 5, 2005 and his DLI of March 31,
2010.  (Tr. 86.)  She explained as follows:

> Claimant received treatment for PTSD in 2005 & 2006.  7/06 PhD follow up notes
> that claimant complained of "bad dreams" nightly, flashbacks of an accident 4-
> 5x/month, hypervigilant as well.
>
> There is minimal [mental status examination] findings and no info regarding
> [activities of daily living] from [alleged onset date to date last insured.] There is
> insufficient evidence to fully assess claimant's pscyh functioning prior to DLI.

(*Id.*)

### 2.        Physical Impairments

On April 22, 2014, state agency physician Gary Hinzman, M.D., reviewed Kafantaris'
medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.
(Tr. 75-76.)  With regard to the period between Kafantaris' September 2005 alleged onset date
and March 2010 DLI, Dr. Hinzman concluded the evidence was insufficient to fully assess his
physical limitations.  (*Id.*)

Dr.  Hinzman then performed an evaluation of Kafantaris' current physical RFC.  He
found Kafantaris could lift and carry 20 pounds occasionally and 10 pounds frequently; stand
and/or walk about 6 hours in an 8 hour workday; and sit about 6 hours in an 8 hour workday.
(*Id.*)  He further concluded Kafantaris had an unlimited capacity to balance, but could only
occasionally climb ramps and stairs; climb ladders, ropes, and scaffolds; stoop; kneel; crouch;
and crawl.  (*Id.*)  Dr. Hinzman found Kafantaris had no manipulative or visual limitations, but

should avoid even moderate exposure to unprotected heights due to his degenerative disc disease and status post fusion.  (*Id.*)

On June 18, 2014, state agency physician Leanne Bertani, M.D., reviewed Kafantaris' medical records and completed a Case Analysis.  (Tr. 85.)  Dr. Bertani determined the "evidence is insufficient to fully assess [Kafantaris'] conditions prior to his [date last insured] of March 31, 2010."  (*Id.*)  She did not complete an assessment of Kafantaris' current physical functional limitations.  (*Id.*)

**D.      Hearing Testimony**

During the December 17, 2015 hearing, the ALJ explained she would focus her questions on the time period prior to Kafantaris' March 2010 DLI.  (Tr. 38.)  With this in mind, Kafantaris testified to the following:

- During the relevant time period, he was unmarried and lived with his sister in a house.  (Tr. 39.)  He had a driver's license but lost it when he got a DUI in 2004 or 2005.  (Tr. 40.)

- He went through the tenth grade in high school but then dropped out.  (Tr. 41.)  He then went to work for his father.  (*Id.*)  He worked in the blast furnace area at Republic Steel for many years, from 1978 to approximately 1992.  (Tr. 42.)  His last full-time job was at a bridge painting company.  (Tr. 41.)

- In 2004 or 2005, while working for the bridge painting company, he was electrocuted on the job.  (Tr. 44.)  The electricity went through his feet, hands, and stomach.  (*Id.*)  He fractured his back as a result of this accident and "was actually pronounced dead."  (*Id.*)  He was hospitalized for several weeks, first at University of Cincinnati hospital and then at MetroHealth in Cleveland.  (*Id.*)  While at MetroHealth, he also had some psychological treatment due to the trauma he experienced from the electrocution.  (Tr. 45.)  He did not go back to work after the electrocution, except for small side jobs "here and there."  (Tr. 47.)

- As a result of the electrocution, he cannot see out of his right eye.  (Tr. 50-51.)  His left hand was particularly injured in the accident, which is problematic because he is left handed.  (Tr. 51.)  He tried to rehabilitate his left hand after the

16

accident and it "improved a little bit."  (*Id.*)  However, he ran out of medical insurance in approximately 2007 or 2008 and thereafter stopped receiving treatment or medication.  (Tr. 47, 49, 54.)

- His right eye vision has gotten worse, as has his left hand.  (Tr. 51-52.)  His entire left hand (fingers, palm, and thumb) is constantly numb. (Tr. 52-53.)  As a result, he drops things and has difficulty grasping objects.  (*Id.*)  He favors his right hand and is now able to write with his right hand.  (*Id.*)

- He also suffered from pain in his back and legs.  (Tr. 45, 50.)  From 2005 to 2010, he was able to walk "a block or two."  (Tr. 48.)  He was able to stand for an hour, sit for an hour, and lift 20 pounds.  (Tr. 49.)  He was taking Percocet but stopped after losing his insurance in 2007 or 2008.  (Tr. 49.)  Currently, he just takes Advil for his pain.  (*Id.*)

- He also had problems with alcohol prior to his onset date.  (Tr. 55-56.)  His alcohol use was "real bad" after the accident, resulting in his divorce.  (*Id.*)  He never received any formal treatment for his alcohol issues, but did attend some meetings.  (*Id.*)  His alcohol issue is better now.  (*Id.*)  He periodically drinks "a couple beers," but he is "controlling it."  (Tr. 55-56.)

- On a typical day during the relevant time period, he "just sat around the house."  (Tr. 50.)  Occasionally he would play with his grandkids.  (*Id.*)  His pain levels vary depending on the weather.  (Tr. 51.)

- He testified he had informed Social Security that he became disabled on September 5, 2005 and confirmed this date was correct.  (Tr. 43.)  He explained he picked that date because "that was when I was electrocuted;" i.e., during the year 2005.  (*Id.*)

The VE testified Kafantaris had past work as a blast furnace keeper helper (heavy, semi-skilled, SVP 3) and paint company laborer (heavy, unskilled, SVP 2).  (Tr. 58.)  The ALJ then posed the following hypothetical question:

Could you assume a hypothetical individual of the Claimant's age and education with the past jobs you described and further assume this individual is limited to light work, specifically lifting and carrying occasionally 20 pounds and frequently 10 pounds with sitting, standing, and walking up to six hours of the workday, and push and pull as much as he can lift and carry. With the additional limitations of only frequent handling on the left side and frequent fingering on the left side, frequent feeling on the left side, with occasional climbing stairs and ramps, never climbing ladders or scaffolds.  Frequently balancing. Occasionally stooping,

17

kneeling, crouching, and crawling.  Never unprotected heights.  Never any moving mechanical parts.  And never operating a motor vehicle.  Can this hypothetical individual perform any of the past jobs you described?

(Tr. 59.)

The VE testified the hypothetical individual would not be able to perform Kafantaris' past work as a blast furnace keeper helper and paint company laborer, but would be able to perform other representative jobs in the economy, such as inspector or hand packager (light, unskilled, SVP 2), cleaner or housekeeping cleaner (light, unskilled, SVP 2), and router (light, unskilled, SVP 2).  (Tr. 59-60.)

The ALJ then asked the VE to "please assume all the limitations as expressed in hypothetical one with the change of exertional level to sedentary."  (Tr. 60.)  The VE testified such an individual would not be able to perform any of the previously identified jobs, but would be able to perform other representative jobs in the economy such as document worker or document preparer (sedentary, unskilled, SVP 2), sorting or inspecting (sedentary, unskilled, SVP 2), and callout operator (sedentary, unskilled, SVP 2).  (Tr. 60-61.)

The ALJ then asked as follows:

Q:      If I changed this hypothetical, the, excuse me, the handling, fingering, and feeling to occasional for the left-hand side, would that change your answer for other work?

A:      It would, Your Honor.  If, and I believe, the left hand is the dominant hand, is that correct?

Q:      Yes.

A:      Positions such as the cleaner would be appropriate jobs.  The router is one that could be performed with limited use of the non– the dominant hand.  Any type of hand packaging or inspecting would probably be inappropriate.

18

(Tr. 61.) Counsel then asked as follows:

> Q: In regards to the handling, fingering, and feeling, does the DOT make a distinction between use of the dominant hand and non-dominant hand?

> A: It does not.

> Q: Okay. So the testimony that you're giving us is based upon your experience and background as, as being a vocational expert?

> A: That is correct.

> Q: Okay. In, in that regard, do you have an opinion as to whether or not the occupational basis for those two jobs that you mentioned, the cleaner job and the rotor job, would be diminished by just occasional grasping, fingering, and handling? Or excuse me, reaching, handling, and fingering?

> A: The cleaner position would probably be reduced by about 10 to 15 percent. The other position, I don't believe it would because a lot of that requires an individual to work for at least a fair amount of time in an office copying different kinds of information. And the Claimant indicated that when it comes to any type of writing activity, he does that with the right hand, not the left hand.

> Q: Okay. And in regards to the sedentary jobs that you identified in response to the third hypothetical question, if we drop those down to occasional in nature, did you say that that eliminated those particular positions?

> A: In my opinion, they will.

(Tr. 61-62.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

19

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  *See* 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Kafantaris was insured on his alleged disability onset date, September 5, 2005, and

remained insured through March 31, 2010, his date last insured ("DLI.")  (Tr. 20.)  Therefore, in order to be entitled to POD and DIB, Kafantaris must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2010.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of September 5, 2005 through his date last insured of March 31, 2010 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairment: degenerative disc disease of the lumbar spine (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could no more than occasionally handle, finger or feel with the left upper extremity.  He could not climb ladders, ropes, or scaffolds.  He could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl.  He could frequently balance.  The claimant must avoid all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December ** 1959 and was 50 years old, which is

21

defined as a younger individual age 18-49 [sic] on the date last insured.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from September 5, 2005, the alleged onset date, through March 31, 2010, the date last insured.

(Tr. 20-28.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

22

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### Onset Date

In his first assignment of error, Kafantaris argues, summarily, the ALJ's decision is not based upon substantial evidence because it "failed to mention or apply SSR 83-20 to determine Plaintiff's onset date." (Doc. No. 13 at 9.) Kafantaris further asserts remand is required because the ALJ failed to either recognize the fact Kafantaris had been awarded SSI benefits in 2014 or consult a medical expert ("ME") in determining an appropriate onset date. (*Id.*)

The Commissioner maintains the ALJ properly determined Kafantaris' alleged disability onset date to be September 5, 2005. (Doc. No. 15 at 6.) She notes, in making this determination, the ALJ properly considered the fact Kafantaris himself alleged he became disabled on that date, both in his disability applications and during the hearing. (*Id.*) The Commissioner also argues the ALJ properly relied on Kafantaris' testimony that he stopped working on September 5, 2005. (*Id.*) She maintains "Plaintiff's award of SSI has no bearing on his application for DIB because the award of SSI applied to a period that is entirely inapplicable to the present case," and asserts "Plaintiff offers no explanation as to why a subsequent favorable determination under a different

24

title of the Act that applied to a different time frame would have any bearing on the case at hand."  (*Id.* at 7.)   Lastly, the Commissioner notes Kafantaris has not suggested a different onset date he believes would have been more appropriate, citing no medical evidence that would indicate an alternative date.  (*Id.*)

Social Security regulations place the burden on a claimant to prove the existence of a disability.  *Foster v. Haller*, 279 F.3d 348, 353 (6th Cir. 2001).  However, "[o]nce a finding of disability is made, the ALJ must determine the date of onset."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.  2006).  Social Security Ruling 83-20 governs the determination of disability onset date.[5]  *See* SSR 83-20, 1983 WL 31249 (1983).  That Ruling provides "[f]actors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence."  *Id*. at *1.  It further explains "the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence."  *Id*.  Of particular relevance herein, SSR 83-20 provides as follows:

### Onset in Disabilities of Traumatic Origin

For disabilities of traumatic origin, onset is the day of the injury if the individual is thereafter expected to die as a result or is expected to be unable to engage in substantial gainful activity (SGA) (or gainful activity) for a continuous period of at least 12 months (see SSR 82-52, PPS-89, Titles II and XVI: Duration of the Impairment). The fact that the claimant worked on the day of onset is not relevant, irrespective of the hours worked and money earned.

---

[5] Social Security Rulings do not have the force of law, but are "binding on all components of the Social Security Administration" and represent "precedent final opinions and orders and statements of policy and interpretations" adopted by the Commissioner.  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272, fn 1 (6th Cir. 2010) (citing 20 CFR § 402.35(b)(1)).

\* \* \*

#### Precise Evidence Not Available--Need for Inferences

 In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

\* \* \*

The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition).  The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death.  Convincing rationale must be given for the date selected.

*Id*. at \* 2-3.  HALLEX I–2–6–70 (regarding ME testimony) similarly provides that "[a]n ALJ is encouraged to consult with an ME when he or she must make an inference about the onset of disability."  *See* HALLEX I–2–6–70 at Note 3 (citing SSR 83–20).

The Sixth Circuit has found an ALJ is not required to refer with specificity to SSR 83–20 when making disability onset date determinations, so long as the ALJ conducts the analysis required by the Ruling.  *See McClanahan*, 474 F.3d at 834 ("Because the ALJ conducted the analysis required by [SSR 83–20], his failure to mention it by name is not fatal to the decision").  Moreover, with regard to the need for an ME, courts in this Circuit have determined SSR 83–20 does not require an ME be called in every case but only when "there is no development of the medical record on which the ALJ can rely to ascertain onset."  *Id*. at 837.  *See*

26

*also Yosowitz v. Colvin*, 2016 WL 5173319 at *17 (N.D. Ohio Sept. 1, 2016) (same); *Slack v.*

*Astrue*, 2010 WL 420022 at * 3 (N.D. Ohio Jan. 29, 2010) (same); *Martin v. Comm'r of Soc. Sec.*,

2014 WL 1048150 at * 18 (E.D. Mich. March 18, 2014) (stating that SSR 83–20 requires an ALJ

to call an ME only "when the record is ambiguous regarding onset date").

Here, at step two, the ALJ determined Kafantaris had one severe impairment:

degenerative disc disease of the lumbar spine.[6]  (Tr. 22.)  The ALJ acknowledged Kafantaris'

testimony regarding his electrocution in 2005, but explained as follows:

> In addition to the severe impairments identified above, the claimant has alleged
> that his ability to work is limited by electrocution in 2005, bleeding around his
> brain, blindness in one eye, a foot injury requiring pin placement and back injuries
> in 2005 and November 2013 (2E).  The claimant testified that these conditions
> were associated these with a workplace accident occurring in 2004 or 2005.
>
> There are no clinical, diagnostic or laboratory findings in evidence indicative of the
> claimant's electrocution, intracranial bleeding or blindness or other abnormality of
> the claimant's vision in evidence.  Records of MetroHealth Medical Center reflect
> the claimant's diagnoses with vertebral compression fracture and multiple severe
> burns in September and October 2003 (4F/45); however, the claimant  reported
> only back and leg pain as residual, physical symptoms associated with these
> injuries during a December 2005 evaluation by a physician (2F/50-51).  CT
> examination of the examination of the claimant's head and brain was described as
> negative during a November 2008 emergency room visit found no evidence of
> intracranial hemorrhage or hematoma (1F/35).  While the claimant' s  complaints
> of blurred vision at time and twitching of his right eyelid were noted during an
> October 2013 ophthalmologic examination, his visual acuity was found to be equal
> at 20/30 bilaterally (3F/3).
>
> * * *
>
> In addition to residual physical symptoms associated with his workplace injuries,
> the claimant testified during the December 2015 hearing that he experienced
> depression, anxiety and alcohol abuse following his accident.  Progress notes of
> Anita B. Gantner, Ph.D. document the claimant's ongoing participation in

---

[6]Kafantaris does not argue the ALJ erred in failing to recognize any of Kafantaris' other
physical or mental impairments as "severe" at step two of the sequential analysis.

27

> rehabilitative psychology from December 2004 through July 2006 (2F/2-13, 28-48 and 53-64). Dr. Gantner encouraged the claimant's employment "as a therapeutic goal" as early as December 2004, but noted his reported difficulty obtaining employment due to his lack of a high school education (2F/2). Dr. Gantner found that the claimant was in good spirits, despite ongoing disturbing dreams about his accident in March 2005, six months prior to the alleged onset of disability (2F/11). In May 2005, Dr. Gantner indicated that the claimant had not reached maximum medical improvement, but was ready to return to work, despite his depression (2F/62). Her subsequent progress notes reflect the claimant's improving anxiety (2F/28, 29) and euthymic mood despite reports of infrequent disturbing dreams or flashbacks regarding his accident (2F/30).

(Tr. 22-23.)

After determining Kafantaris' impairments did not meet or equal the severity of a Listing, the ALJ proceeded at step four to consider Kafantaris' self-reported symptoms as well as the medical and opinion evidence. (Tr. 24.) The ALJ first acknowledged Kafantaris' testimony he had been "unable to work since sustaining an electrical shock in a workplace accident occurring in 2004 or 2005." (Tr. 25.) The ALJ also noted Kafantaris' testimony that, as a result of this accident, he suffered from blindness of the right eye, back and leg pain, left hand numbness affecting his ability to grasp and use his fingers, as well as depression and alcohol abuse. (*Id.*) The ALJ determined, however, Kafantaris' statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible" for several reasons. (*Id.*)

The ALJ first found "medical evidence does reflect the claimant's remote injuries consistent with his testimony," noting records showing a history of treatment in September and October 2003 for a closed fracture of the thoracic vertebra and burns to Kafantaris' hands, abdomen, back, and abdominal wall. (*Id.*) The ALJ, however, found as follows:

> While the claimant's history is noted, there are no treatment or progress notes in evidence from the period between September 2003 and December 15, 2005,

28

when he was evaluated by Michael A Harris, M.D.  Dr. Harris noted that he had not seen the claimant since September 2004, when he released the claimant to work.  The claimant reported that he did return to work 'at full capacity' from September 2004 to November 2005, when he was 'laid off due to the seasonal aspect of his job.'

Dr. Harris noted the claimant's ongoing complaints of thoracic and lumbar pain with right leg pain worse with prolonged standing.  Additionally, the claimant reported memory issues and shoulder pain over several months, which he attributed this to painting (2F/50).

Dr. Harris noted that MRI examination of the claimant's thoracic spine in November 2003 showed a compression fracture of the T3 vertebra and x-ray examination of the lumbar spine demonstrated degenerative changes (2F/50).  On examination of the claimant, Dr. Harris observed the claimant's tenderness over the lumbar spine junction and limited flexion of the lumbar spine.  However, straight leg raise testing was negative and the claimant demonstrated normal motor strength, sensation and reflexes throughout the extremities. Dr. Harris noted the claimant's poor recall as he could remember only two of three objects presented after a delay of five minutes (2F/51).  Dr. Harris prescribed the claimant a trial of Voltaren for his complaints of back pain and recommended his ongoing treatment with Dr. Gantner, but concluded that the claimant 'can work at a light to medium capacity,' lifting up to twenty-five pounds.  He further indicated that the claimant should avoid heights and that it would be unsafe for him to paint bridges (2F/51).

There is no evidence of the claimant's medical treatment between Dr. Harris' December 2005 evaluation and November 29, 2008, when he presented to the emergency room with complaints of right eyelid, mouth and neck [injuries] sustained in an assault (1F/ 13).  As noted above, CT examination of the examination of the claimant's head and brain was negative, while CT examination of the claimant's cervical spine showed mild degenerative disc disease at the C5-6 and C6-7 levels without evidence of acute bony injury (1F/33, 35).  He was treated for a laceration of the right eyelid and discharged (1F/13-17).

(Tr. 25-26.)

At the outset, the Court notes Kafantaris' argument is both unclear and poorly developed.  Aside from reciting the legal standard, Kafantaris' argument consists of a mere three sentences, as follows:

> In this case, Plaintiff was awarded a period of disability and SSI based upon the January 15, 2014 application. (Tr. 37-38, 239-252 . . . ). However, the ALJ, who did not call on the services of a medical advisor at the hearing or by interrogatories, issued an adverse decision. He neither (1) mentioned or applied SSR 83-20; (2) mentioned the January 15, 2014 determination; or (3) obtained the evidence to support the favorable determination. Therefore, the ALJ's decision is contrary to law and/or not based upon substantial evidence.

(Doc. No. 13 at 11.) There is no further development of Kafantaris' argument nor any reasoned explanation as to how the evidence in this case demonstrates the ALJ erred with regard to the determination of Kafantaris' onset date. Further, Kafantaris' argument is somewhat confusing. While Kafantaris states he was awarded a period of disability ("POD") and SSI, the records reflects this was not, in fact, the case. Rather, the award letter cited by Kafantaris in his brief (dated June 6, 2014) indicates he was awarded SSI only under Title XVI of the Social Security Act.[7] There is no mention of an award for a period of disability under Title II.[8] (Tr. 239-251.) Regardless, the Court construes Kafantaris' brief as arguing the January 2014 favorable SSI determination triggered the ALJ's requirement under SSR 83-20 to determine his onset date. The Court further construes Kafantaris' brief as asserting the ALJ should have called on the services

---

[7] As noted *supra*, there are several benefits programs under the Social Security Act, including the Disability Insurance Benefits Program (DIB) of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program (SSI) of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. "While the two programs have different eligibility requirements, 'DIB and SSI are available only for those who have a 'disability.'" *Scott v. Comm'r of Soc. Sec.*, 2012 WL 995265 at * 7 (E.D. Mich. March 5, 2012) (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir.2007)).

[8] Specifically, Kafantaris' award letter states as follows: "We have carefully reviewed the facts of your case and have approved the claim for Supplemental Security Income (SSI) benefits that you filed on January 15, 2014. As of April 2014, you met all the rules to be eligible for SSI based on disability." (Tr. 239.)

of an ME to make this determination and his failure to do requires remand.

As noted above, SSR 83-20 "'applies only when there has been a finding of disability and it is necessary to determine when the disability began.'" *Clendening v. Comm'r of Soc. Sec.*, 482 Fed. Appx. 93, 95 (6th Cir. 2012) (quoting *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997). *See also Velez v. Comm'r of Soc. Sec.*, 2017 WL 661651 at * 6 (N.D. Ohio Feb. 17, 2017); *Monville v. Comm'r of Soc. Sec.*, 2017 WL 4081854 at * 3 (E.D. Mich. Sept. 15, 2017). Kafantaris appears to assert that, because his application for SSI was granted at the initial level, the ALJ was required pursuant to SSR 83-20 to determine his onset date in the context of evaluating his separate applications for POD and DIB. Kafantaris cites no case law supporting the argument that SSR 83-20 applies under these circumstances.

The Commissioner does not directly address this issue either. The Commissioner relies on *Asbury v. Comm'r of Social Security*, 83 Fed.Appx. 682 (6th Cir. Nov.21, 2003) and *Presley v. Comm'r of Soc. Sec.*, 23 Fed. Appx. 229, 231 (6th Cir. 2001) for the proposition that "a subsequent favorable decision is not material to a claimant's disability application for a prior period." (Doc. No. 15 at 7.) These cases, however, do not consider the specific issue presented herein; i.e., the effect of multiple disability applications on an ALJ's duty to determine a claimant's onset date pursuant to SSR 83-20. Rather, these cases consider the legally distinct question of whether, under principles of administrative *res judicata,* a favorable disability determination for a later time period is binding on an ALJ in the context of an application seeking disability benefits for an earlier time period.[9]

---

[9] For example, in *Asbury*, the plaintiff applied for, and was denied social security disability insurance benefits for the period ending May 23, 1995. The plaintiff then filed a second application for benefits, and the Social Security Administration granted her

31

In sum, neither party addresses the particular legal issue presented here, which the Court frames as follows: Where applications for POD, DIB, and SSI are filed concurrently, the SSI application is granted at the initial level but the POD and DIB applications are denied, and an ALJ is thereafter only presented with applications for POD and DIB –  does the award of SSI at the initial level constitute a "finding of disability" for purposes of triggering the ALJ's obligation under SSR 83-20 to determine an onset date with respect to the application for POD and DIB?

As another court within this Circuit observed, "Social Security Ruling 83-20 fails to explicitly address whether the prerequiste finding of disability must be in the case instantly before the ALJ, or if a previous finding of disability is sufficient to trigger its application." *Smits v. Colvin*, 2015 WL 505465 at * 7 (E.D. Ky Feb. 6, 2015).  Although not cited by either party, the Court notes there are cases in this Circuit that have required an ALJ to determine a claimant's onset date under SSR 83-20 where a prior finding of disability exists.

For example, in *Sharay v. Comm'r of Soc. Sec.*, 2016 WL 8114220 (E.D. Mich. August 28, 2016), the plaintiff was found disabled at the initial level with respect to his SSI application

---

benefits beginning on May 24, 1995.  The plaintiff appealed the denial of her first application, asserting that the ALJ erred by not applying principles of administrative *res judicata* to bind the Commissioner with respect to the disability finding under her second application. The Sixth Circuit rejected this argument, finding "Asbury seeks in effect to bootstrap her success on the second application so as to require the Commissioner to find disability for the earlier period unless the agency can demonstrate a change in her condition." *Id*. at 685.  The court concluded the Commissioner was not required to make an affirmative showing of changed circumstances prior to May 24, 1995, and the ALJ's decision was supported by substantial evidence.  Similarly, in *Presley*, the Sixth Circuit found that, while plaintiff was awarded SSI benefits as of March 19, 1998, "the subsequent award of benefits is not relevant to his condition before January 6, 1998, the date of this current decision."  *Presley*, 23 Fed. Appx. at *2.  Neither of these decisions discuss the applicability of SSR 83-20 in the context presented herein.

as of July 18, 2011, but was denied DIB on the basis of insufficient evidence of disability prior to his DLI of December 31, 1987.  After a hearing, an ALJ issued a written decision finding plaintiff was not disabled prior to his DLI.  On appeal, plaintiff argued the ALJ erred in failing to obtain an ME as required by SSR 83-20, "given the fact that plaintiff is currently receiving SSI disability benefits and given the lack of any opinion by a state agency medical consultant regarding medical equivalence."  *Id*. at * 5.  The district court found the ALJ was not required to call an ME because "the ALJ analyzed the record, both pre and post DLI, articulated his reasons for the weight given to the treating physician, and had substantial evidence to support his findings."  *Id*. at * 18.  The court went on to find SSR 83-20 did "not compel a different result," noting "where the medical record was well developed and carefully reviewed by the ALJ, courts have found that the ALJ did not err by failing to call a medical expert to infer an onset date."  *Id*. at *19.  Thus, although the court did not expressly discuss the issue, it implicitly determined SSR 83-20 was applicable in light of the plaintiff's earlier favorable SSI determination.

In addition, several courts considering this issue in the context of Children's Insurance Benefits ("CIB") have determined that, where an earlier favorable SSI determination has been made, an ALJ reviewing a subsequent application for CIB is required to determine an appropriate onset date pursuant to SSR 83-20.  *See e.g., Houston v. Comm'r of Soc. Sec*., 2011 WL 6152992 (E.D. Mich Sept. 30, 2011); *Williams v. Comm'r of Soc. Sec*., 2014 WL 822191 (E.D. Mich. Feb. 10, 2014); *Martin v. Comm'r of Soc. Sec*., 2014 WL 1048510 (E.D. Mich. March 18, 2014); *Smits v. Comm'r of Soc. Sec*., 2015 WL 505465 at * 7- 8 (E.D. Ky. Feb. 6, 2015).  At least one court, however, has expressed "serious doubts" about whether this result is "consistent with the

intent of the [Social Security] Act's authors."  *Smits*, 2015 WL 505465 at *8.[10]

Here, the Court need not decide the issue.  Even assuming *arguendo* the finding of disability in connection with Kafantaris' SSI application did, in fact, trigger the ALJ's duty to determine an onset date under SSR 83-20,[11] the Court finds the ALJ satisfied her obligations under that Ruling.  As noted above, although the ALJ did not expressly cite SSR 83-20, the ALJ thoroughly reviewed and considered the medical and opinion evidence, both before and after Kafantaris' DLI.  Specifically, the ALJ acknowledged Kafantaris was diagnosed with closed thoracic vertebra fracture and burns in September and October 2003, but noted he was able to engage in full-time work from September 2004 until November 2005, when he was laid off.  (Tr. 25-26.)  The ALJ noted that, the following month, Dr. Harris found tenderness and limited flexion over Kafantaris' lumbar spine but also observed normal motor strength, sensation, and reflexes, as well as negative straight leg raise testing.  (Tr. 26.)  At that time, Dr. Harris

---

[10]  As that court explained: "First, the ALJ is only to consider evidence presented in the claimant's claim file. . . . Because Smits' present claim for CIB is separate and apart from her 1985 disability claim, it is not clear why the ALJ should be bound by this earlier finding, although there is no readily discernible reason why a file should be limited to one claim.  Second, the approach lauded by Smits seems to take ALJs out of the five-step sequential process, which ALJ's are bound to follow, without any clear indication that such a detour is intended.  *See* 20 C.F.R. § 404.1520.  If ALJs are, in fact, supposed to defer to past findings of disability for purposes of applying SSR 83–20 then this could easily be made clear. . . . . The regulations [however] have no such rule.  Instead, the language of SSR 83–20 provides that ALJs are responsible for both making a disability determination and establishing an onset date.  *See* SSR 83–20 at *1 ("In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability.")  Third, the Court notes that a distinct process exists to amend an onset date."  *Smits*, 2015 WL 505465 at * 7.

[11] The record before this Court does not contain the file relating to Kafantaris' SSI application.  Thus, the Court cannot determine the factual basis for the Commissioner's finding that Kafantaris "met all the rules to be eligible for SSI based on being disabled." (Tr. 239.)

34

determined Kafantaris could "work at a light to medium capacity," with the restrictions that he could lift up to 25 pounds and should avoid heights and painting bridges.  (*Id*.)

The ALJ then correctly observed "there is no evidence of the claimant's medical treatment between Dr. Harris' December 2005 evaluation and November 29, 2008, when he presented to the emergency room with complaints of right eyelid, mouth and neck [injuries] sustained in an assault."  (*Id.*)  The ALJ noted, at that time, a CT of Kafantaris' cervical spine showed mild degenerative disc disease.  (*Id*.)  Earlier in the decision, the ALJ discussed Kafantaris' post-DLI emergency room treatment for an ankle fracture in November 2010, after he had fallen down stairs while intoxicated.  (Tr. 23.)  The ALJ noted the fracture was healing well as of March 2011.  (*Id*.)  The ALJ also discussed Kafantaris' hospitalization in November 2013 after he fell backwards from a ladder.  (*Id*.)

Finally, the ALJ discussed Kafantaris' mental health treatment with Dr. Ganter between December 2004 through July 2006.  (Tr. 23.)  In particular, the ALJ noted Dr. Gantner's conclusion Kafantaris was ready to return to work, despite his depression, in May 2005.  (*Id*.)  The ALJ also cited Dr. Gantner's subsequent progress notes documenting Kafantaris' improving anxiety with exposure therapy.  (*Id*.)

In sum, the ALJ thoroughly analyzed the record for indications that disability onset occurred prior to Kafantaris' March 2010 DLI, and articulated her reasons for finding the medical evidence did not support such a finding.  Although Kafantaris appears to suggest an earlier onset date would have been more appropriate, the ALJ "need not disprove a possible earlier onset date, even if [it] is supported by substantial evidence, as long as the onset date determined by an [ALJ] is supported by substantial evidence."  *Shrader v. Astrue*, 2012 WL

35

5383120 at * 5 (E.D.Mich. Nov.1, 2012).  *See also Besaw v. Sec'y of Health & Human Servs.*,
966 F.2d 1028, 1030 (6th Cir.1992); *Jennings v. Comm'r of Soc. Sec.*, 2013 WL 6019129 at * 8
(N.D. Ohio Nov. 13, 2013). Here, the ALJ fully and accurately recounted the medical evidence,
both pre and post Kafantaris' DLI.  The ALJ's determination Kafantaris' onset date was
September 5, 2005 is supported by substantial evidence.

      The Court further finds the ALJ did not err in failing to consult an ME.  As noted above,
SSR 83-20 does not require an ME be called in every case but only when "there is no
development of the medical record on which the ALJ can rely to ascertain onset."  *McClanahan*,
474 F.3d at 837.  *See also Yosowitz*, 2016 WL 5173319 at *17; *Slack*, 2010 WL 420022 at * 3;
*Martin*, 2014 WL 1048150 at * 18.  Here, while the medical record before the ALJ was not
extensive (particularly regarding Kafantaris' physical condition), it did contain treatment notes
from two of Kafantaris' treating physicians, Drs. Harris and Gantner, as well as objective
medical evidence and ER records dating from the relevant time period.  Moreover, the record
contained Dr. Harris' December 2005 opinion that Kafantaris "can work at light to medium work
capacity, up to 25# lift, but should avoid heights."  (Tr. 459-460.)  The ALJ performed a
thorough and considered review of this evidence, and properly found it did not support a finding
of disability.

      Given the above, the Court finds the ALJ was not required by SSR 83-20 to consult an
ME regarding Kafantaris' onset date.  Kafantaris has not shown the medical record was
ambiguous or underdeveloped as to his disability onset, nor has he otherwise demonstrated that

the ALJ was required to make an inference about the onset of disability.[12]  To the contrary, the

onset date chosen by the ALJ (September 5, 2005) matches the onset date alleged by Kafantaris

himself, and is consistent with both the medical record and his work history.  Accordingly, the

Court finds the ALJ was not required to consult an ME regarding the issue of onset.  *See*

*McClanahan*, 474 F.3d at 837 (SSR 83–20 only requires an ME when "there is no development

of the medical record on which the ALJ can rely to ascertain onset"); *Slack*, 2010 WL 420022 at

* 3 (same);  *Martin*, 2014 WL 1048150 at * 18 (SSR 83–20 requires an ALJ to call an ME "when

the record is ambiguous regarding onset date").

      For all the reasons set forth above, the Court finds Kafantaris' first ground for relief

without merit.  While the ALJ did not specifically mention SSR 83-20, she followed the

guidelines set out in the Ruling.  *See McClanahan*, 474 F.3d at 834 ("Because the ALJ conducted

the analysis required by [SSR 83–20], his failure to mention it by name is not fatal."); *Shelby v.*

*Comm'r of Soc. Sec.*, 2011 WL 3321303 at * 9 (S.D. Ohio May 12, 2011) (same). The ALJ's

evaluation of Kafantaris' onset date is supported by substantial evidence.

### *RFC*

      In his second assignment of error, Kafantaris argues the RFC is "contrary to law and not

based upon substantial evidence" because the ALJ failed to develop the record as follows:

> "(1) Recontact Dr. Gantner for an RFC when she was treating Plaintiff (ALJ
> noted that her "progress notes do not contain detailed mental status
> evaluation which would complete evaluation of his alleged mental
> impairments" and she "offered no opinion as to any appropriate functional

---

[12] Notably, Kafantaris has not identified an alternative onset date which he believes is better supported by the record.  Nor did he suggest a different onset date during the hearing before the ALJ or otherwise seek to amend his onset date at any point during the administrative proceedings below.

limitations in December 2004") (T. 24). 20 C.F.R § 404.1520b(c)1.

(2) Recontact: MetroHealth System to obtain any medical records prior to 2014 (T. 66-69, 82-85, 492); WC for records stemming from the electrocution (which should include the records from the University of Cincinnati Medical Center); and/or obtain the evidence that formed the basis of granting the January 15, 2014 SSI application. 20 C.F.R § 404.1520b(c)2.

(3) Send Plaintiff out for a physical consultative examination (including request for RFC on or before March 31, 2010). 20 C.F.R § 404.1520b(c)3.

(4) "[C]all on the services of a medical advisor" because the onset date must be inferred." SSR 83-20.

(Doc. No. 13 at 13.)  Kafantaris further asserts the ALJ improperly speculated as to the seriousness of Kafantaris' condition and substituted his opinion for that of "trained professionals."  (*Id*. at 14.)  Finally, he claims the ALJ failed to identify "specific discrepancies" in the record to support her finding Kafantaris was not disabled.  (*Id*.)

The Commissioner argues the RFC is supported by substantial evidence.  (Doc. No. 15 at 8-9.)  With regard to Kafantaris' claim the ALJ should have further developed the medical record, she notes Kafantaris was represented by counsel at the administrative level and, therefore, the ALJ did not have a heightened duty to recontact physicians or order medical records.  (*Id*. at 10.)  The Commissioner also points out Kafantaris "has not offered any explanation as to why he was unable to produce evidence in support of his claim."  (*Id*.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

38

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, after discussing the medical and opinion evidence regarding Kafantaris' physical and mental impairments, the ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work[13] as defined in 20 CFR 404.1567(b) except the claimant

---

[13] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires

could no more than occasionally handle, finger or feel with the left upper extremity.   He could not climb ladders, ropes, or scaffolds.   He could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl.  He could frequently balance.  The claimant must avoid all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles.

(Tr. 24.)

The Court finds the RFC is supported by substantial evidence.  As noted above, the ALJ fully discussed Kafantaris' hearing testimony and the medical evidence regarding both his physical and mental impairments.  (Tr. 22-27.)  With regard to Kafantaris' physical impairments, the ALJ acknowledged Kafantaris's electrocution-related injuries in 2003 and 2004, including his closed thoracic vertebral fracture, severe burns, depression, anxiety, nightmares/flashbacks, and alcohol abuse.  (*Id.*)  However, the ALJ discounted the severity of Kafantaris' symptoms in light of contemporaneous treatment records showing he returned to work in September 2004, worked full-time until November 2005, and complained only of residual back and leg pain and memory issues during a treatment visit with Dr. Harris in December 2005.  (Tr. 25-26.)  At that time, Dr. Harris noted some tenderness and limited flexion, but also found normal motor strength, sensation and reflexes, as well as negative straight leg raise.  (*Id.*)  The ALJ emphasized the absence of any treatment records relating to Kafantaris' physical impairments between Dr. Harris' December 2005 evaluation and November 2008, when Kafantaris presented to the ER with complaints of

a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

right eyelid, mouth and neck injuries sustained in an assault.  (*Id.*)  The ALJ noted a CT scan of

Kafantaris' cervical spine in November 2008 showed only mild degenerative disc disease. (Tr.

26.)  Finally, the ALJ weighed the medical opinion evidence as follows:

> As for the opinion evidence, the residual functional capacity set forth above is
> consistent with the opinion of Dr. Harris, the claimant' s treating physician
> (2F/51).  Medical consultants that reviewed the claimant's case file at the
> request of the State Agency concluded that there was insufficient evidence to
> evaluate the claimant's alleged physical impairments prior to his March
> 31, 2010 date last insured.  However, these consultants concluded that later
> medical evidence including the claimant's right ankle and spinal injuries in
> November 2010 and November 2013 respectively supported exertional and
> postural limitations generally consistent with those set forth in the residual
> functional capacity (1A and 3A).  Evidence received at the hearing level,
> including the claimant's testimony to extent it was consistent with objective
> evidence, supports the imposition of postural and exertional limitations.
> Accordingly, the undersigned gave the opinions of these medical consultants
> little weight as they pertain to the period prior to the claimant's date last
> insured.

(Tr. 26-27.)

With regard to Kafantaris' mental impairments, the ALJ acknowledged, at step two,

Kafantaris' complaints of depression, anxiety, nightmares, flashbacks, and alcohol abuse.  (Tr.

23.)  However, the ALJ determined Kafantaris' mental conditions were not severe in light of Dr.

Gantner's contemporaneous progress notes (from December 2004 through July 2006) showing

improvement with therapy.  (*Id.*)  The ALJ also noted Dr. Gantner's determination in May 2005

that Kafantaris was ready to work, despite his depression, and the lack of any medical opinion as

to any specific mental functional limitations.  (Tr. 23-24.)

The ALJ concluded "[g]iven all the factors analyzed in this case, including but not

limited to the claimant's failure to report symptoms consistent with his testimony to treating

sources during the period for adjudication, the conservative treatments offered to the claimant,

41

and the relative lack of strongly positive clinical signs documented in treatment notes, a preponderance of the evidence supports a finding that he could have performed a range of light exertion work activities with the postural and environmental limitations set forth above through his March 31, 2010 date last insured." (Tr. 27.)

Substantial evidence supports the RFC.  As discussed at length above, treatment records show Kafantaris was able to return to full-time work for over a year following his electrocution. (Tr. 459-460.)  While he showed some tenderness and flexion in his lumbar spine in December 2005, Dr. Harris' examination findings were otherwise normal and he opined Kafantaris could return to "light to medium work" with the restriction he lift no more than 25 pounds and avoid heights.  (*Id.*)  Kafantaris points to no other treatment records prior to his DLI, aside from a November 2008 ER visit during which a CT scan showed mild degenerative disc disease.[14]  (Tr. 285.)  As for his mental impairments, the ALJ correctly noted Dr. Gantner found Kafantaris could return to work, despite his depression, in May 2005 and, further, significant improvement in Kafantaris' PTSD symptoms with exposure therapy.  (Tr. 371, 343, 337, 338, 339.)

---

[14]  As noted *supra*, in order to qualify for DIB, a claimant must "establish the onset of disability prior to the expiration or his [or her] insured status."  *Garner v.Heckler,* 745 F.2d 383, 390 (6th Cir. 1984).  The Sixth Circuit has explained that "evidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx 841, 845 (6th Cir. 2004) (citation omitted).  To be relevant to the disability decision, "[p]ost-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 Fed. Appx. 478, 480 (6th Cir. 2003).  *See also Jones v. Comm'r of Soc. Sec.*, 2015 WL 1004681 at *8 (E.D. Mich. Mar. 6, 2015) ("evidence issued after a date last insured generally lacks probative value."); *King v. Berryhill*, 2017 WL 1907265 at * 15 (N.D. Ohio March 23, 2017); *Kingery v. Comm'r of Soc. Sec.*, 142 F.Supp.3d 598, 602 (S.D. Ohio 2015); *Hibbard v. Astrue*, 537 F. Supp.2d 867, 873 (E.D. Ky. 2008).  Here, Kafantaris has neither argued or demonstrated the post-DLI medical evidence relates back to his condition during the relevant time period.

Kafantaris asserts he should have been limited to sedentary work.[15]  The Court

disagrees.  There is no medical opinion evidence in the record supporting Kafantaris' argument

he is limited to sedentary work.  To the contrary, during the relevant time period, Dr. Harris

concluded (consistent with the RFC adopted by the ALJ) that Kafantaris could perform light

work with certain restrictions.  (Tr. 459-460.)  Moreover, while Kafantaris testified at the

hearing he could only stand for an hour, sit for an hour, and walk for "a block or two," he does

not direct this Court's attention to any medical evidence in the record that would support such

severe functional limitations.

 Kafantaris asserts remand is required, however, precisely because of the lack of

medical evidence from the relevant time period.  Specifically, he claims the ALJ had a duty to

develop the record by recontacting Dr. Gantner, MetroHealth, and the Bureau of Workers

Compensation for medical records, ordering a physical consultative examination, and calling on

the services of an ME to determine an appropriate RFC for the time period before his March

2010 DLI.  (Doc. No. 13 at 13.)

In the Sixth Circuit, it is well established that the claimant—not the ALJ—has the

burden to produce evidence in support of a disability claim.  *See, e.g., Wilson v. Comm'r of Soc.*

---

[15] "Sedentary work" is defined as follows: "Sedentary work involves lifting no more than
10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers,
and small tools. Although a sedentary job is defined as one which involves sitting, a
certain amount of walking and standing is often necessary in carrying out job duties.
Jobs are sedentary if walking and standing are required occasionally and other sedentary
criteria are met." 20 CFR § 404.1567(a).  SSR 83–10 provides that "Since being on one's
feet is required "occasionally" at the sedentary level of exertion, periods of standing or
walking should generally total no more than about 2 hours of an 8–hour workday, and
sitting should generally total approximately 6 hours of an 8–hour workday."  SSR 83–10,
1983 WL 31251 (1983).

*Sec.*, 280 Fed. App'x. 456, 459 (6th Cir. 2008) (citing 20 C.F.R. § 404.1512(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y. of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."); *cf. Wright–Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of his employment when his past work was part of the record and was the basis of the initial decision to deny benefits). However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 Fed. App'x. at 459 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)).

In the case at bar, it is undisputed Kafantaris was represented by counsel at the administrative level. (Tr. 33, 237-238.) Thus, the ALJ had no heightened duty to develop the record and "the ultimate burden of proving disability" remained squarely on Kafantaris. *See Wilson*, 280 Fed. Appx. at 459 (citing *Trandafir v. Comm'r of Soc. Sec.*, 58 Fed. Appx. 113, 115 (6th Cir. Jan. 31, 2003)). *See also Meadows v. Astrue*, 2012 WL 5205798 at * 4 (N.D. Ohio Sept. 25, 2012); *Guy v. Astrue*, 2010 WL 1141526 at * 10-11 (M.D. Tenn. March 4, 2010). Therefore, to the extent the record is incomplete, such deficiency is imputed to Kafantaris and,

therefore, that deficiency fails to provide justification for a remand.[16]

Citing 20 C.F.R. § 404.1520b, Kafantaris nonetheless argues the ALJ should have further developed the record in light of the determination of state agency physicians Drs. Hinzman and Bertani that there was insufficient evidence to assess Kafantaris' physical functional limitations prior to his March 2010 DLI.

20 C.F.R. § 404.1520b provides, in relevant part, as follows:

(b) Incomplete or inconsistent evidence. In some situations, we may not be able to make our determination or decision because the evidence in your case record is insufficient or inconsistent. We consider evidence to be insufficient when it does not contain all the information we need to make our determination or decision. We consider evidence to be inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques. If the evidence in your case record is insufficient or inconsistent, we may need to take the additional actions in paragraphs (b)(1) through (4) of this section.

(1) If any of the evidence in your case record, including any medical opinion(s) and prior administrative medical findings, is inconsistent, we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have.

(2) If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency. We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (b)(2)(i) through (b)(2)(iv) of this section. We might not take all

---

[16] The Court notes that, during the hearing, counsel for Kafantaris did not request the ALJ hold the record open to allow additional time to obtain records, nor did he request the ALJ's assistance in obtaining medical records. To the contrary, when asked if he had anything additional to submit, counsel for Kafantaris stated "we believe the record is complete." (Tr. 36.) Moreover, Kafantaris has not directed this Court's attention to anything in the record indicating his counsel requested the ALJ order a physical consultative examination or call upon the services of an ME.

45

of the actions listed below. We will consider any additional evidence we receive together with the evidence we already have.

> (i) We may recontact your medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. If we obtain medical evidence over the telephone, we will send the telephone report to the source for review, signature, and return;

> (ii) We may request additional existing evidence;

> (iii) We may ask you to undergo a consultative examination at our expense (see §§ 404.1517 through 404.1519t); or

> (iv) We may ask you or others for more information.

(3) When there are inconsistencies in the evidence that we cannot resolve or when, despite efforts to obtain additional evidence, the evidence is insufficient to determine whether you are disabled, we will make a determination or decision based on the evidence we have.

The Court finds the ALJ did not err in failing to recontact Kafantaris' physicians, request additional records, order a physical consultative examination, or request the services of an ME. As an initial matter, the above regulation does not require an ALJ to take the actions outlined above but, rather, grants an ALJ the discretion to do so if he or she deems it necessary under the particular circumstances presented.  *See Landsaw*, 803 F.3d at 214 ( "the regulations do not require an ALJ to refer a claimant to a consultative specialist."); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)("An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."); *McClellan v. Comm'r of Soc. Sec*., 2017 WL 5054275 at * 3 (E.D. Mich. Sept. 29, 2017) ("ALJs are not required to order consultative examinations, but merely have the discretion to do so if necessary"); *Peterson v. Comm'r of Soc. Sec*., 2017 WL 343625, at *3, n. 2 (W.D. Mich. Jan. 24, 2017) ("Although it is within the

discretionary power of an ALJ to order a consultative examination, it is not required and may be ordered when 'the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [the] claim.' ").  *See also Ruby v. Colvin*, 2014 WL 5782930 at \*13 (S.D. Ohio Nov. 6, 2014) (an ALJ's "determination of whether a medical expert is necessary is inherently a discretionary decision."); *O'Neill v. Colvin*, 2014 WL 3510982 at \* 18 (N.D. Ohio July 9, 2014) ("ALJs retain discretion as to whether to call a medical expert").  *See also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010);  *Nebra A. Simpson v. Comm'r of Social Security*, 2009 WL 2628355 at \* 8 (6th Cir. Aug. 27, 2009); *Vanderhoff v. Comm'r of Soc. Sec.*, 2016 WL 6211442 at \* 3 (W.D. Mich. Oct. 25, 2016); *Hudson-Kane v. Berryhill*, 247 F.Supp.3d 908, 915-916 (M.D. Tenn. 2017).

Here, the ALJ did not abuse her discretion in resolving Kafantaris' claim based on the record before her.  As noted above, while the medical record was not extensive (particularly regarding Kafantaris' physical condition), it did contain treatment notes from two of Kafantaris' treating physicians, Drs. Harris and Gantner, as well as objective medical evidence and ER records dating from the relevant time period.  Moreover, the record contained Dr. Harris' December 2005 opinion Kafantaris "can work at light to medium work capacity, up to 25# lift, but should avoid heights."  (Tr. 459-460.)  Although Dr. Hinzman and Bertani found insufficient evidence to assess Kafantaris' physical functional limitations prior to his DLI, the ALJ accorded these opinions little weight based on her thorough and considered review of the medical evidence, including Kafantaris' hearing testimony and Dr. Harris' December 2005 opinion.

The Court finds the ALJ properly determined the medical record provided a sufficient basis on which to find Kafantaris could perform a reduced range of light work.  Kafantaris'

argument to the contrary is without merit.

***Hypothetical***

Finally, Kafantaris argues "the ALJ's finding that 'the claimant could do no more than occasionally handle, finger or feel with the left upper extremity' is contrary to law and not supported by substantial evidence." (Doc. No. 13 at 15.) His entire argument on this issue is as follows:

> First, the DOT does [not] make a distinction between the use of a dominate [sic] and non-dominate [sic] hand in terms of feeling, handling, and fingering. (Tr. 61.) [The VE] Mr. Simone testified that the occupational base would have been reduced if Plaintiff would have to 'occasionally' feel, handle and finger with both hands. (Tr. 62.) Last, as Mr. Simone confirmed and explained, a sedentary work finding would have resulted in a disability determination.

(*Id.*)

The Commissioner argues the ALJ's hypothetical questions accurately reflected Kafantaris' limitations. (Doc. No. 15 at 11.) She notes that, "although there is no medical opinion from the relevant period that limited Plaintiff to occasional handling, fingering, and feeling, the ALJ appears to have credited Plaintiff's complaints that he had numbness and difficulty grasping with his left hand." (*Id.*) The Commissioner asserts Kafantaris has failed to cite any medical evidence reflecting greater limitations, noting December 2005 examination findings that Kafantaris had normal strength and reflexes in his extremities. (Tr. 460.) Finally, the Commissioner argues the VE did not, in fact, testify the occupational base would be reduced with a limitation to occasional feeling, handling, and fingering. (Doc. No. 15 at 11.)

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported

48

by evidence in the record, it need not reflect unsubstantiated allegations by the claimant.  *See*

*Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  In fashioning a

hypothetical question to be posed to a VE, the ALJ is required to incorporate only those

limitations that he accepts as credible.  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429

(6th Cir. 2007) (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

However, where the ALJ relies upon a hypothetical question that fails to adequately

account for all of the claimant's limitations, it follows that a finding of disability is not based on

substantial evidence.  *See Ealy*, 594 F.3d at 516 ("In order for a vocational expert's testimony in

response to a hypothetical question to serve as substantial evidence in support of the conclusion

that a claimant can perform other work, the question must accurately portray a claimant's physical

and mental impairments."); *Brooks v. Comm'r of Soc. Sec.*, 531 Fed. App'x 636, 644 (6th Cir.

Aug. 6, 2013) ("We have stated on a number of occasions that a hypothetical question posed to a

vocational expert must include a 'complete assessment of [the claimant's] physical and mental

state and should include an accurate portrayal of her individual physical and mental

impairments.'") (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002));

*Varley*, 820 F.2d at 779.

Here, during the hearing, the ALJ asked the VE to assume the following:

> Could you assume a hypothetical individual of the Claimant's age and education
> with the past jobs you described and further assume this individual is limited to
> light work, specifically lifting and carrying occasionally 20 pounds and
> frequently 10 pounds with sitting, standing, and walking up to six hours of the
> workday, and push and pull as much as he can lift and carry.  **With the
> additional limitations of only frequent handling on the left side and frequent
> fingering on the left side, frequent feeling on the left side**, with occasional
> climbing stairs and ramps, never climbing ladders or scaffolds.  Frequently
> balancing. Occasionally stooping, kneeling, crouching, and crawling.  Never
> unprotected heights.  Never any moving mechanical parts.  And never operating

a motor vehicle.

(Tr. 59) (emphasis added). The VE testified the hypothetical individual would be able to perform

representative jobs in the economy, such as inspector or hand packager (light, unskilled, SVP 2),

cleaner or housekeeping cleaner (light, unskilled, SVP 2), and router (light, unskilled, SVP 2).

(Tr. 59-60.)

      Later, the ALJ asked as follows:

Q:     If I changed this hypothetical, the, excuse me, the handling, fingering, and feeling to occasional for the left-hand side, would that change your answer for other work?

A:     It would, Your Honor.  If, and I believe, the left hand is the dominant hand, is that correct?

Q:     Yes.

A:     Positions such as the cleaner would be appropriate jobs.  The router is one that could be performed with limited use of the non– the dominant hand. Any type of hand packaging or inspecting would probably be inappropriate.

(Tr. 61.)  Counsel then asked as follows:

Q:     In regards to the handling, fingering, and feeling, does the DOT make a distinction between use of the dominant hand and non-dominant hand?

A:     It does not.

Q:     Okay.  So the testimony that you're giving us is based upon your experience and background as, as being a vocational expert?

A:     That is correct .

Q:     Okay.  In, in that regard, do you have an opinion as to whether or not the occupational basis for those two jobs that you mentioned, the cleaner job and the rotor job, would be diminished by just occasional grasping, fingering, and handling? **Or excuse me, reaching, handling, and fingering?**

A:    The cleaner position would probably be reduced by about 10 to 15 percent.  The other position, I don't believe it would because a lot of that requires an individual to work for at least a fair amount of time in an office copying different kinds of information.  And the Claimant indicated that when it comes to any type of writing activity, he does that with the right hand, not the left hand.

Q:    Okay.  And in regards to the sedentary jobs that you identified in response to the third hypothetical question, if we drop those down to occasional in nature, did you say that that eliminated those particular positions?

A:    In my opinion, they will.

(Tr. 61-62) (emphasis added).

In the decision, the ALJ found Kafantaris could perform a reduced range of light work, including (among other things) that he could "occasionally handle, finger or feel with the left upper extremity."  (Tr. 24.)  The ALJ the concluded Kafantaris could not perform his past relevant work, but could perform the jobs of housekeeping cleaner, router, and hand packer.  (Tr. 28.)

As an initial matter, to the extent Kafantaris is arguing the ALJ erred in failing to find greater manipulative restrictions, this argument is entirely without merit.  As the Commissioner correctly notes, Kafantaris has failed to cite any medical or opinion evidence suggesting greater left hand manipulative limitations would have been warranted during the time period prior to his DLI.  Moreover, the Court notes, in December 2005, Dr. Harris examined Kafantaris and found normal strength, sensation, and reflexes in his extremities.  (Tr. 460.)  Accordingly, Kafantaris' suggestion the ALJ erred in failing to assess greater manipulative restrictions is not well taken.

Kafantaris' brief is, again, not entirely clear but it appears he is asserting the ALJ erred because the VE testified a restriction to occasional handling, fingering, and feeling would erode the occupational base.  In this Circuit, the decision of whether work exists in significant numbers

51

is a "decision [that] should ultimately be left to the trial judge's common sense in weighing the

statutory language as applied to a particular claimant's factual situation."  *Hall v. Bowen*, 837 F.2d

272, 275 (6th Cir. 1988).  In making this determination, the judge should consider many criteria,

some of which may include: the level of claimant's disability; the reliability of the vocational

experts testimony; the reliability of the claimant's testimony; the distance the claimant is capable

of traveling to engage in work; the isolated nature of the jobs; and the types and availability of

such work.  *Hall*, 837 F.2d at 275.  *See also Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 904

(6th Cir. 2016).  The *Hall* factors are "suggestions only" and an ALJ does not need to "explicitly

consider each factor."  *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir.1999).  The determination of

whether work exists in significant numbers can be determined with reference to either the national

economy or a local/regional area.[17]  *Harmon*, 168 F.3d at 292.

Kafantaris' argument that remand is required because of the erosion of the identified

jobs, is without merit.  First, a close reading of the hearing testimony indicates the VE testified

the number of cleaner jobs would "probably be reduced by about 10 to 15 percent" with a

restriction to occasional "*reaching*, handling, and fingering."  (Tr. 62) (emphasis added).  The

RFC, however, did not limit Kafantaris to occasional *reaching*, handling, and fingering; rather, it

---

[17] Work exists in the national economy when it exists in significant numbers either in the
region where the claimant lives "or in several other regions of the country."  20 C.F.R §§
404.1566(a), 416.966(a).  "It does not matter whether work exists in the immediate area in
which you live."  20 C.F.R. §§ 404.1566(a)(1), 416.966(a)(1).  *See  Geiger v. Apfel,* 229
F.3d 1151, 2000 WL 1257184, at *2 (6th Cir. 2000) ("[T]he Commissioner need not
show that a significant number of jobs exists in the local economy, only that the claimant
is capable of performing other jobs existing in the national economy.").  *See also Riggs
on behalf of Riggs v. Comm'r of Soc. Sec.*, 2017 WL 821672 at * 5 (S.D. Ohio March 2,
2017); *Brown v. Comm'r of  Soc. Sec.*, 2015 WL 4644910 at * 11 (N.D. Ohio Aug. 4,
2015).

limits him to occasional handling, fingering or *feeling*.  (Tr. 24.)  Thus, it is not apparent the 10 to 15% reduction in jobs is applicable to the RFC assessed by the ALJ herein.

Moreover, even if the Court were to construe the VE's testimony regarding the 10 to 15% erosion of the cleaner jobs as applying to the ALJ's RFC, this does not necessitate a remand. First of all, the VE testified the number of router jobs (52,000 in the national economy) would not be eroded by this restriction.  (Tr. 59-60, 61-62.)  Second, reducing the number of cleaner jobs in the national economy (134,000) by 15% still leaves 113,900 such jobs.  (Tr. 59.)  Combining the number of cleaner and router positions, the total number of such jobs available in the national economy that Kafantaris could perform is 165,900.

Kafantaris has not articulated any meaningful argument (or cited any legal authority) indicating this is an insufficient number.[18]  To the contrary, while there is no "magic number" that constitutes a "significant number" of jobs, the number of jobs identified by the VE herein (165,900) falls well within the number of jobs the Sixth Circuit has found to be sufficient evidence for an ALJ to determine that work existed in significant numbers.[19]  *See e.g., Taskila,*

---

[18] Kafantaris does not argue the ALJ improperly applied the *Hall* factors and, thus, the Court does not consider that issue herein.

[19] The Court notes the ALJ mistakenly included the hand packer job at step five.  The Court, however, agrees any such error was harmless in light of the fact that the numbers associated with the cleaner and router jobs are significant.  *See, e.g., Nejat v. Comm'r of Social Security*, 359 Fed.Appx. 574, 579 (6th Cir. Dec. 22, 2009)(holding that even if ALJ erred in determining that the claimant could perform two of the three jobs identified by the vocational expert, the number of jobs in the third category was enough to support the ALJ's finding); *Poe v. Comm'r of Soc. Sec*., 342 Fed.Appx. 149, 157-58 (6th Cir. 2009) (concluding that the ALJ's erroneous reliance on one of the jobs identified by a vocational expert was harmless because the expert otherwise identified a significant number of jobs in the national economy that the claimant could perform); *see also Jones v. Comm'r of Social Security*, 2016 WL 47968 (E.D. Mich. Jan. 5, 2016); *Miller v. Astrue*, 2012 WL 6607006 (N.D. Ohio Nov. 26, 2012), *adopted and affirmed* 2012 WL

819 F.3d at 905 ("Six thousand jobs in the United States fits comfortably within what this court and other have deemed 'significant'")(collecting cases); *Bishop v. Shalala*, 1995 WL 490126, at * 2–3 (6th Cir. Aug.15, 1995) (finding 6,100 jobs nationally constituted a significant number of jobs); *Lewis v. Secretary of Health and Human Servs.*, 1995 WL 124320, at *1 (6th Cir. March 22, 1995) (finding 14,000 jobs nationally constituted a significant number of jobs); *Nash v. Sec'y of Health & Human Servs.*, 59 F.3d 171, 1995 WL 363381, at *3 (6th Cir. 1995) (holding that 70,000 sedentary jobs in the national economy was a significant number).

Accordingly, and in the absence of any meaningful argument to the contrary, the Court finds substantial evidence supports the ALJ's determination that jobs existed in significant numbers in the national economy that Kafantaris could have performed.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


  *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 2, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

6599800 (N.D. Ohio Dec. 18, 2012).